Revised December 3, 1998

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 97-50362

---

ROSE BUTLER; ERMA GRACIA

                              Plaintiffs-Appellants,

v.

YSLETA INDEPENDENT SCHOOL DISTRICT

                              Defendant-Appellee

---

Appeals from the United States District Court
for the Western District of Texas

---

November 16, 1998

Before KING, GARWOOD, and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

    We review the district court's entry of judgment against two
teachers suing the Ysleta Independent School District for sexual
harassment.  The district court granted summary judgment against
one and a motion for judgment as a matter of law against the other
following a jury verdict in her favor.  We find that there was no
hostile environment actionable under Title VII, and affirm.

                              I.

    Rose Butler and Erma Gracia were teachers in the East Point
Elementary School when they began receiving anonymous mail at their

homes.  Gracia began receiving letters early in the fall semester of 1992,and Butler began receiving similar letters sometime thereafter.  Some of the letters Gracia received suggested that she would benefit from a romantic relationship: "You probably could use a man in your life to calm some of that frustration down," "A dude a day keeps the crazes [sic] away!", and "What You Need Is Few [sic] good Men," the last of which was affixed to a card containing three personal ads from a local newspaper.  Other mailings included statements making no claims about Gracia's romantic life, such as "You are still trying to control everyone's life [sic]." While some of the letters were typewritten, others were more elaborate, apparently composed on a personal computer and including varied typography and occasional illustrations.

The letters Butler received were similar to Gracia's, including for example notes stating, "When you drive down the street you look like you're pissed off," and "When are you going to start dressing like an adult? Don't you have a mirror at home?" Arguably the most offensive mailings to Butler were a greeting car containing a picture of the naked buttocks of four women with a caption stating that "the winner is you (for being the perfect asshole)," and a cartoon entitled "Bitch Woman."

Gracia began to suspect that someone from work was sending her the letters, and she brought the letters to Principal Kirk Irwin. In turn, Irwin called in Assistant Principal Kenneth Walker and requested that he look into the letters.  Gracia later inquired of

2

Walker whether something was being done. Gracia testified that he stated that nothing was being done. Gracia also testified that Walker handed her the letters and stated that he thought he knew who had written them and that he would get back to her.

In April 1993, Gracia discovered that Butler had also been receiving anonymous mail, in addition to prank phone calls. Sometime also that spring, both teachers, along with at least 13 others, including 11 females, were assigned different grade levels within the school, new assignments they did not want. Gracia and Butler began to suspect that Irwin was responsible for the letters they received. In part, Gracia became suspicious because the unwanted grade reassignment occurred during Teacher Appreciation Week. She also suspected Irwin because a letter Butler received used the phrase "winds of change," which was apparently a favorite phrase of the principal's, and because the misspellings of certain words suggested Irwin's authorship. Gracia testified that once she began to suspect Irwin, she withdrew from a number of extracurricular activities and started to leave school early. Gracia and Butler nonetheless waited until the end of the school year to report their suspicions. They testified that they waited because the central office had always accepted Irwin back after periods of absence and were afraid he would return.

In late May, Butler reported the anonymous mail to the El Paso Police Department. Detective Scott Graves began investigating, requesting that Irwin come to the police station. Irwin came on

3

July 1 but became upset when Graves requested that he submit to fingerprinting. Irwin refused to give his prints. Detective Graves also met that day with two Ysleta officials, Superintendent Anthony Trujillo and Associate Superintendent Robert Durrett, to request copies of any fingerprints of Irwin they had on file. He hoped to match such fingerprints to one that he lifted from a letter that Butler had given him, but Trujillo and Durrett indicated that they had no such fingerprints.

Trujillo and Durrett were previously unaware of the plaintiffs' allegations, but they had been investigating Irwin for sending lewd faxes to male administrators. These faxes were similar in execution and tone to the mailings Gracia and Butler received. One, for example, stated, "On the underwear of life * You are a poop stain," and another stated, "Heard you were busy making love to yourself." One of these faxes was identical to the mailing Butler received that urged the recipient to begin dressing like an adult.

Durrett consulted with Mario Lewis, Ysleta's attorney, who then met with Graves. In an effort to obtain his fingerprints, Lewis and Durrett enclosed materials in a plastic liner and on July 8 Lewis handed the packet to Irwin. Lewis also asked Irwin directly if he had been harassing employees, although he may have been inquiring only about the faxes to male employees. Graves tested the plastic liner but found the fingerprints there unsuitable. A warrant was issued to obtain Irwin's fingerprints.

4

Meanwhile, the plaintiffs met with Durrett on July 13, 1993, and again on July 19. Gracia testified that at the July 19 meeting, they requested that Durrett remove Irwin from the school immediately, and that Durrett responded that there was a great deal of support for Irwin at the central office. Durrett left the matter to the police. On returning from a vacation, he called a couple of times to check on the status of the police inquiry, but did nothing more.

Graves, who had been sidetracked by an unrelated murder investigation, found on August 5th that the fingerprint from the letter Butler received matched Irwin's. Shortly thereafter, Irwin was suspended with pay and notified that Trujillo was contemplating suspending him without pay and recommending his termination. Trujillo ultimately allowed Irwin to take paid sick leave until October 15, which was the effective date of his resignation. In the meantime, the district appointed as interim principal Nancy Evans, who refused to cancel Gracia's and Butler's grade level reassignments.

Both teachers filed suit against Ysleta, claiming sex discrimination under a "hostile work environment" theory pursuant to Title VII. See 42 U.S.C. § 2000e. The defendant filed a motion for summary judgment before Chief Judge Hudspeth, who granted it as to Butler but denied it as to Gracia. The court found that Gracia's case raised a factual issue as to whether the school district took prompt remedial action after she brought the

5

harassing letters to the attention of Irwin and Walker in December 1992, and followed up with Walker afterward. Butler, on the other hand, notified no one in the district about her problem until July 1993. The court rejected Butler's claims that the district had "constructive knowledge" of the harassment on the basis of the investigation of Irwin's faxes to male administrators, or that Irwin's status as an agent for the school district made the district liable. After July 1993, the court found, the district took prompt and effective remedial action.

The case was subsequently transferred to Judge Furgeson, who presided over a jury trial of Gracia's claim. The jury rendered a verdict in favor of Gracia in the amount of $35,000, and Gracia filed a motion for judgment on the verdict. Ysleta, however, moved for judgment as a matter of law notwithstanding the verdict pursuant to Federal Rule of Civil Procedure 50(b), and the court granted the motion. The court based its decision on three separate grounds. First, it found that the letters Gracia received were not so pervasive or severe as to create a hostile work environment, emphasizing that no harassment occurred at work. Second, the court found that the harassment did not alter a term or condition of her employment. Third, the court found that the plaintiff failed to establish that the defendant did not take prompt remedial action.

Separately, Gracia moved for sanctions against Ysleta or its counsel for statements suggesting that the school district was poor and self-insured, contrary to the judge's decision on a motion in

6

limine barring such references. The court refused to sanction. Gracia has appealed this refusal, and both plaintiffs appeal the judgments entered against them.

## II.

We are witnesses to the birth of a second generation of sexual harassment law. The first generation was heralded by the D.C. Circuit's decision in <u>Barnes v. Costle</u>, 561 F.2d 983 (D.C. Cir. 1977), and the publication in 1979 by Catharine A. MacKinnon of *Sexual Harassment of Working Women*. It reached maturity with <u>Meritor Savings Bank v. Vinson</u>, 477 U.S. 57 (1986), in which the Supreme Court held that a hostile work environment could create a valid Title VII claim.

At the center of the second generation of sexual harassment law are four important cases the Supreme Court decided last Term. <u>See</u> <u>Faragher v. City of Boca Raton</u>, 118 S. Ct. 2275 (1998) (finding an employer vicariously liable for harassment where it failed to exercise reasonable care to prevent the harassment); <u>Burlington Industries, Inc. v. Ellerth</u>, 118 S. Ct. 2257 (1998) (finding an employer subject to liability for harassment by a supervisor of an employee, but allowing the employer an affirmative defense if no tangible job action resulted); <u>Gebser v. Lago Vista Ind. Sch. Dist.</u>, 118 S. Ct. 1989 (1998) (finding a school not vicariously liable for sexual harassment by a teacher of a student, when the school did not have notice of the harassment); <u>Oncale v. Sundowner</u>

<u>Offshore Servs., Inc.</u>, 118 S. Ct. 998 (1998) (holding that sex discrimination consisting of same-sex sexual harassment is actionable).[1]

These rulings were preceded by substantial work in the academy, particularly scholarly commentators who reexamined the theoretical underpinnings of sexual harassment law.  <u>See</u> Kathryn Abrams, <u>The New Jurisprudence of Sexual Harassment</u>, 83 Cornell L. Rev. 1169 (1998); Anita Bernstein, <u>Treating Sexual Harassment with Respect</u>, 111 Harv. L. Rev. 445 (1997); Katherine M. Franke, <u>What's Wrong with Sexual Harassment?</u>, 49 Stan. L. Rev. 691, 764 (1997); Vicki Schultz, <u>Reconceptualizing Sexual Harassment</u>, 107 Yale L.J. 1683 (1998).  While the nuances of these writers' approaches to sexual harassment differ, all emphasize that sexual harassment is discrimination based on sex, not merely workplace behavior with sexual overtones.

This clarification and refining of sexual harassment doctrine come at an important time.  The volume of sexual harassment complaints filed with the Equal Employment Opportunity Commission

---

[1]These cases were decided after the district court issued its decision.  In reviewing the district court's decision in Butler's case, we must therefore decide whether, under the Supreme Court's refined standards, there is a genuine issue of material fact regarding an element of her case.  <u>See</u> <u>Hirras v. National R.R. Passenger Corp.</u>, 95 F.3d 396, 399 (5th Cir. 1996).  Similarly, with respect to Gracia's claims, we must decide whether "the facts and inferences point so strongly in favor of the movant that a rational jury could not arrive at a contrary verdict," <u>Waymire v. Harris County</u>, 86 F.3d 424, 427 (5th Cir. 1996), assuming that the jury had been properly instructed.

and state agencies has more than doubled since 1991. <u>See</u> <http://www.eeoc.gov/stats/harass.html> (visited Oct. 13, 1998) (reporting 6,883 complaints lodged in 1991, and 15,889 in 1997). To ensure the continued vitality of Title VII as a remedy for the sexual harassment wrong, this court must separate meritorious claims from those that identify offensive conduct but do not state a claim under Title VII. The claims here fall in this latter category. While the letters the plaintiffs received were undoubtedly immature and inappropriate, and while some of the letters had a sexual content, a consideration of all the circumstances does not permit the conclusion that the letters created a hostile or abusive environment at the workplace.

The touchstone of our inquiry, of course, must be the jurisprudence of the Supreme Court and the words of the statute itself. The <u>Burlington</u> Court found that "the labels <u>quid pro quo</u> and hostile work environment are not controlling for purposes of establishing employer liability." 118 S. Ct. at 2270-71. As the Court noted, <u>see id.</u> at 2264, the terms "quid pro quo" and "hostile work environment" do not appear in the relevant statute, 42 U.S.C. § 2000e-2(a)(1). This section forbids an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's ... sex."

9

The Supreme Court distinguished between two classes of cases, those in which "a supervisor takes a tangible employment action against the subordinate," 118 S. Ct. at 2268, and those where "the agency relation aids in commission of supervisor harassment which does not culminate in a tangible employment action," id. at 2269. We will consider these in order.

"Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates. A tangible employment decision requires an official act of the enterprise, a company act." Id. at 2269. When a supervisor takes such an action, the action by the supervisor becomes the action of the employer. See id. In such cases, the employer is necessarily liable. Although the Supreme Court did not concisely define "tangible employment action," it did note that such an action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. at 2268. It also stated that such an action "in most cases inflicts direct economic harm." Id. at 2269.

The plaintiffs suffered no tangible employment action as a result of Irwin's conduct. Even assuming that Gracia withdrew from extracurricular activities as a result of the letters, as she claims, this does not constitute a "change in employment status" under the Supreme Court definition. The plaintiffs also claim that

10

Irwin's decision to reassign them to different grade levels constituted a tangible employment action. We need not decide, however, whether teaching at one grade level entails "significantly different responsibilities" from teaching at another, for two reasons. First, the plaintiffs have offered no evidence connecting their grade level reassignments to the letters they received, and the reassignment of a number of other employees suggests no such evidence exists. Second, the plaintiffs' grade reassignments were ultimately reversed. While Gracia complains that the interim principal initially did not want to allow her to teach at her customary grade level, she admitted that she was allowed to do so after another teacher offered to trade with her. Thus, even if an employment action was contemplated, or even favored, by the school district, none occurred.

We thus turn to the second class of sexual harassment violations identified by the Supreme Court. Even if no tangible employment action is taken against an employee, an employer may be vicariously liable "for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Id. at 2270.[2]

---

[2]The employer may offer an affirmative defense consisting of two elements. Specifically, the employer must show that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id. Given our conclusion that there was no hostile environment, we need not address whether a reasonable jury could

11

The Court clarified the definition of "hostile environment," however, by noting that the conduct must be "severe or pervasive." Id. at 2264. The Court elaborated this in Faragher: "[I]n order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." 118 S. Ct. at 2283 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993)). Whether an environment meets this standard depends on "'all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. (quoting Harris, 510 U.S. at 23).[3]

A reasonable jury could determine that Gracia and Butler were offended and even frightened by the letters that they received. A reasonable person, however, could not perceive the work environment itself to be hostile or abusive. The factors specifically enumerated by the Supreme Court all militate toward this conclusion. Cf. DeAngelis v. El Paso Mun. Police Officers Ass'n,

_____

conclude that the employer failed to meet its affirmative defense.

[3]The Court further noted that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher, 118 S. Ct. at 2283 (internal quotation marks omitted).

12

51 F.3d 591, 594-96 (5th Cir. 1995) (finding no liability after evaluating the factors elaborated in Harris in a case involving anonymous messages in a workplace newsletter).

First, the allegedly discriminatory conduct--consisting of occasional letters--was infrequent. See id. at 596 (finding that "[f]our printed derogatory references to [the plaintiff] at irregular intervals in two and a half years do not evince sufficient hostility toward her as a matter of law"). We do not place undue weight on this factor, however. Even occasional anonymous letters can be frightening, and irregular receipt of such letters may be even more disarming than letters that arrive like clockwork and become an expected nuisance for which the victim may be prepared. Perhaps it is part of a stalker's modus operandi to surprise a victim when she least expects it. Nonetheless, the frequency factor affords plaintiffs little or no support.

Second, the conduct was less severe than, for example, public circulation or display of similar targeted messages would have been. One scholar, for example, has found the circulation of pornographic materials in the workplace problematic because it would "mark the workplace as an arena in which masculinity is appropriate or even constitutive." Abrams, supra, at 1211. The individual receipt of letters apparently coming from a single individual does not mark the workplace at all, because it does not demonstrate a communal effort to define who is welcome in the workplace.

13

Third, the statements in the letters received by the plaintiffs were also not threatening. As with the first factor, however, we do not place much weight on this consideration, given the anonymous nature of the correspondence. The anonymity of a letter may itself make it threatening, even if the content is innocuous. A threatening statement, such as "I am watching you," is more threatening still when the author is unknown. But here, the anonymous notes had no threatening content whatsoever. At worst, a reasonable person receiving such messages could be afraid that someone dislikes her and objectifies her. We do not diminish the hurt that comes with such knowledge, but we do not find that it supports a finding that a workplace environment is hostile.

Fourth, the correspondence would not interfere unreasonably with a reasonable person's work performance. It is relevant that the letters were received at home, and not at work. To be sure, any unpleasant happenings in an individual's home life may affect work performance. A teacher may become less energetic after a personal tragedy, but we know that does not make the work environment itself hostile. Here, the plaintiff specifically suspected that the writer was someone from work, and she turned out to be correct, but it was not specifically work performance that was affected. The workplace itself is central to the wrong of sexual harassment. See, e.g., Abrams, supra, at 1219 (identifying the "ultimate harm or wrong of sexual harassment" as the perpetuation of "the workplace as a site of male control, where

14

gender hierarchy is the order of the day and masculine norms structure the working environment"); cf. Bernstein, supra, at 495 (arguing that the central concern in a hostile work environment case is whether the employer has treated employees with respect).

While none of the Supreme Court's four factors thus supports plaintiffs' effort to state a claim, the Supreme Court's command that courts look to "all the circumstances" indicates that the list is not exclusive. Our jurisprudence suggests a factor related to but distinct from the second and fourth factors above, whether the complained of conduct undermined the plaintiffs' workplace competence. See DeAngelis, supra, at 593 ("A claim for a sexually hostile working environment is not a trivial matter. Its purpose is to level the playing field for women who work by preventing others from impairing their ability to compete on an equal basis with men."). The letters here commented on the plaintiffs' personal lives and habits, but did not state or suggest that they or women in general were incompetent to be teachers.

Contrary to the children's rhyme, all insults, like sticks and stones, can hurt, but this does not mean that all insults are tortious. As Schultz has persuasively argued, the "core component of [hostile work environment] harassment is conduct designed to undermine a woman's competence." Schultz, supra, at 1769; see also id. at 1762 ("[M]uch of the behavior that creates a hostile work environment is conduct that has the purpose or effect of undermining the perceived or actual competence of women (and some

15

men) who threaten the idealized masculinity of those who do the work."); cf. Franke, supra, at 772 (arguing that for conduct to constitute sexual harassment, it must be "a practice, grounded and undertaken in the service of hetero-patriarchal norms").

That some of the letters plaintiffs received contained sexual content is irrelevant. To be sure, sexualized comments or pictures can undermine competence; for example, a cartoon suggesting that women are incapable of teaching on account of their sex might undermine the ability of women to teach. A plaintiff, however, must show that implicit or explicit in the sexual content is the message that the plaintiff is incompetent because of her sex, and the plaintiffs cannot draw such a connection here.

That Irwin sent messages to male administrators further indicates that the correspondence did not undermine the plaintiffs' competence. To be sure, as the Supreme Court decided in Oncale, a man can be guilty of sexually harassing other men, and presumably an individual could be guilty of sexually harassing both men and women. But Oncale was not a hostile environment case, and, under the circumstances of this case, Irwin's sending of offensive materials to both men and women is evidence that the workplace itself, while perhaps more sexually charged than necessary, was not sexually charged in a way that made it a hostile environment for either men or women. Indeed, the Supreme Court in Oncale explicitly recognized that sexual content is not the Title VII talisman:

16

> We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations. 'The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'

Id. at 998 (quoting Harris, supra, at 25 (Ginsburg, J., concurring)). Butler and Gracia were not exposed "to disadvantageous terms or conditions of employment," and they are thus not entitled to relief.

## III.

We now turn to the district court's refusal to impose sanctions. Rulings on sanctions are subject to an abuse-of-discretion standard. See Willy v. Coastal Corp., 855 F.2d 1160, 1172 (5th Cir. 1988). Perhaps there is a case of such inappropriate conduct by trial counsel that a district court would be required to impose sanctions, but this is not that case.

## IV.

For the reasons above, we AFFIRM the judgments of the district court.

AFFIRMED.

17