**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**December 22, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

)))))))))))))))))))))))))))

No. 03-41620

)))))))))))))))))))))))))))

LADONNA HOCKMAN,

Plaintiff-Appellant,

vs.

WESTWARD COMMUNICATIONS, LLC; ET AL,

Defendants,

WESTWARD COMMUNICATIONS, LLC; WESTWARD COMMUNICATIONS, LP,

Defendants-Appellees.

---

Appeals from the United States District Court
for the Eastern District of Texas

---

Before WIENER and PRADO, Circuit Judges, and LITTLE, District
Judge.[*]

EDWARD C. PRADO, Circuit Judge:[**]

Ladonna Hockman sued Westward Communications, LLC and

Westward Communications, LP (collectively "Westward") asserting

various claims under 42 U.S.C. §§ 2000 et seq. ("Title VII").  The

---

[*] District Judge for the Western District of Louisiana,
sitting by designation.

[**] Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIRCUIT
RULE 47.5.4.

1

district court granted Westward's motion for summary judgment on all claims, and Hockman appealed. We now affirm.

I. Background

Westward owns certain newspapers in East Texas that are involved in this lawsuit: the *Grand Saline Sun* in Grand Saline, the *Wood County Democrat* in Quitman, and the *Edgewood Enterprise* in Edgewood. At all times relevant to this lawsuit, Nell French was the publisher of all three papers and Hockman's immediate supervisor. Oscar Rogers ran a commercial printing press from the back of the *Grand Saline Sun* office. Aggie McDonald was the composition and graphics manager. Molly Harvill was the office manager.

Hockman actually worked for Westward twice. First, she worked as the assistant editor of the *Edgewood Enterprise* from July 30, 1998 to June 30, 1999. The reason for Hockman's 1999 departure is disputed: Hockman claims that she left because of a "personality clash" with the paper's publisher at that time, Jan Adamson; Westward claims that Hockman was involved in a theft. Regardless of the reason, Hockman was rehired in April 2001 as an editor for the *Grand Saline Sun*.

When Hockman rejoined the Westward team, she was provided with a copy of the employee handbook which contains the company's antiharassment policy. The policy provides for the following in the event of a complaint:

2

> If an employee believes that he or she is being subjected to harassment of any kind, the incident(s) must be reported promptly to his/her supervisor. If the employee feels that it would be inappropriate to report the matter to the immediate supervisor, or the matter is not satisfactorily resolved at this level, the employee should report the incident(s) directly to the Director, Human Resources at 440-746-1701.

On July 24, 2001, Hockman signed an acknowledgement form, attesting that she had received a copy of the handbook and understood its provisions.

Hockman claims that soon after she returned to Westward, Rogers began to harass her in the following ways: First, Rogers commented on the body of a former Westward employee, Sheila Ledesma. Specifically, Hockman claims that "[Rogers] would tell her that Sheila Ledesma had a nice behind and body." Next, Hockman claims that beginning in July of 2001, Rogers would brush up against her breasts and behind. Third, Hockman claims that on one occasion, Rogers "slapped [her] behind with a newspaper." Fourth, Rogers once attempted to kiss Hockman. Fifth, on more than once occasion, Rogers asked Hockman to come in early so that they could be alone together. Finally, Rogers once stood in the doorway of the ladies' restroom as Hockman was washing her hands. Rogers stepped aside, however, when Hockman exited the restroom.

On October 11, 2001, Hockman and her coworker, Harvill, told their supervisor, French, that they had been harassed by Rogers. The parties dispute what happened next. Hockman claims that she did not go to French before October of 2001 because she was

3

embarrassed.  However, Hockman discussed Rogers's behavior with Harvill and McDonald before approaching French.  Both women allegedly told Hockman that they had also been harassed by Rogers.

According to Hockman, she and Harvill told French that Rogers had touched them inappropriately, and Hockman told French that Rogers had once tried to kiss her.  In response, French asked Hockman how she wanted the situation handled.  Hockman claims that she responded that she was not sure what French was supposed to do in this situation, that she was sure there was a formal procedure for handling such complaints, and that French should take action in compliance with that procedure.  Hockman claims that French then directed her to a sexual harassment policy which was purportedly for a previous company named Howard and Bluebonnet and was not in effect for Westward during the relevant time period.  Hockman claims that to her knowledge, French never acted on her complaint; Hockman reapproached French once or twice, but French again asked Hockman what she was supposed to do about the situation.

Westward's account of the October 11 and post-October 11 events is completely different.  According to Westward, when approached by Hockman on October 11, 2001, French asked her if she wanted to lodge a formal complaint and Hockman said that she did not; she did not want to jeopardize her working relationship with Rogers.  French claims that she informed Hockman that Rogers's

4

actions may constitute sexual harassment and that they could get fired if they did not file a formal complaint.  Hockman then told French that McDonald would corroborate her allegations, but she nonetheless remained unwilling to file a formal complaint against Rogers.  Rather, Hockman told French that she wanted French to talk to McDonald before taking any formal action.

French claims that she immediately investigated Hockman's allegations.  First, she contacted six other Westward employees who had worked with Rogers.  Each stated that they had neither witnessed nor suffered any harassment at the hands of Rogers.

Next, on approximately October 23, 2001, French met with McDonald, who refused to support Hockman's allegations.  McDonald claimed that she had not experienced inappropriate behavior by Rogers, nor was she aware of any other Westward employee towards whom Rogers engaged in sexually inappropriate behavior.

For the next three weeks, French followed up with Hockman weekly, asking Hockman whether she was ready to file a formal complaint against Rogers.  According to French, Hockman consistently refused to file a complaint.  French thereafter concluded that Hockman's allegations were meritless.

Hockman, however, asserts that she was not hesitant about filing a formal complaint against Rogers after she spoke to French on October 11.  Rather, according to Hockman, French had previously told her "never to go above [French's] head."  Hockman

5

contends that because of French's directive, Hockman believed that she would be fired if she reported the harassment to anyone else.

Westward claims that in the fall of 2001, the Chief Operating Officer of the *Sun* and the *Enterprise*, J. Tom Graham, began analyzing ways to manage the papers more efficiently because both papers were doing poorly financially. Because French divided her time among three different Westward papers, Graham decided to create an assistant publisher position to manage the business and editing duties of the *Sun* and the *Enterprise*. With the creation of such a position, Hockman's editor position would become unnecessary.

Graham wanted someone with business experience to be the new assistant editor; Hockman had none. Accordingly, Graham concluded that she was not qualified for the new job. Hockman was consequently set to be discharged upon the creation of the new position. On February 7, 2002, Wilbur Callaway was offered the assistant editor position. Because Callaway had requested that his wife work with him, Westward offered her a position answering telephones and assisting Callaway at the *Edgewood Enterprise*.

On February 19, 2002, Graham; Robert McMaster, the Chief Executive Officer of Westward; and Gina Fisher, Westward's Director of Human Resources, received a letter from Hockman's attorney stating that Hockman intended to file a complaint with the Equal Employment Opportunity Commission ("EEOC") asserting

6

claims of sexual harassment and sex discrimination against Westward.

According to Westward, Fisher immediately launched an investigation. On February 20, 2002, Fisher contacted Hockman——who refused to speak with Fisher out of her attorney's presence——and French, who told Fisher that Hockman had not wanted to pursue a formal complaint on October 11, 2001. That same day, Fisher contacted McDonald, who stated that she had not witnessed any harassment by Rogers. Fisher also called Bill Holder, the Regional Vice President of Westward. Fisher asked Holder to be present during a phone conversation between Fisher and Rogers. During that conversation, Fisher informed Rogers of the allegations against him, which he emphatically denied.

The next day, Fisher spoke to Hockman by telephone while Hockman was at her attorney's office. Fisher asked Hockman why she had never contacted her after the October 11 meeting with French. Hockman stated that French had told her "never to go above her head."

At that time, Graham, McMaster, and Fisher decided to separate Rogers and Hockman, who were both working at the *Grand Saline Sun*. Westward made Hockman the editor of the *Edgewood Enterprise*. Although, according to Westward, the company had previously decided to discharge Hockman when Callaway's employment began, given the pending harassment claim, Westward now believed

7

that it was better to separate Hockman from Rogers than to terminate her employment. To afford keeping Hockman on as a Westward employee, Westward rescinded its offer of employment to Callaway's wife.

Hockman claims that the *Enterprise* facility was filled with "numerous spiders and webs, hundreds of cricket corpses, dead rats, maggots, old newspapers, thick dust, bodily fluids on the desk and wall and feces and urination," and that she had to clean up this mess in retaliation for her allegations against Rogers. Westward, of course, paints a different picture of the *Enterprise* and Edgewood. Westward claims that as editor of the *Enterprise*, Hockman's pay and benefits did not change; thus, this was a purely lateral transfer. Moreover, Hockman was reimbursed for mileage between Grand Saline (where she lived) and Edgewood (where she worked), even though Hockman's children attended school in Edgewood and she had often made that commute when she worked at the *Sun*. Finally, Hockman had worked at the *Enterprise* during her first stint of employment with Westward.

According to Westward, Fisher was continuing her investigation during this time. On February 28, 2002, she again interviewed both French and Rogers. From March 1st through 4th, she interviewed current and former Westward employees, almost all of whom denied observing or being aware of any sexually inappropriate behavior by Rogers. The only interviewee who told

8

Fisher of any potentially inappropriate behavior by Rogers was Jan Adamson, a former publisher of the *Sun*. Adamson told Fisher that approximately seven or eight years before, Rogers had made "innuendos" at work. However, Adamson also explained that all of the employees were "raunchy in the office." Adamson had been terminated by Westward, and told Fisher that she hoped "Westward would get theirs" and that she "hated Westward." Because of Adamson's bias and the lack of evidence to support Hockman's allegations, Fisher determined that there was no corroborating evidence of harassment or sexually inappropriate behavior by Rogers.

On March 6, Fisher again contacted McDonald. McDonald again denied experiencing any harassment by Rogers. However, she did tell Fisher about discriminatory remarks Hockman had made about Rogers before she had been transferred to Edgewood. According to McDonald, Hockman had learned that a grand jury had refused to indict Hockman's husband's ex-wife on a trespassing charge. Rogers had served as the foreman of the grand jury which had considered the charge. Outraged by the grand jury's decision to "no-bill" her husband's ex-wife, Hockman allegedly stated that "Rogers's job would be gone by next Friday" and referred to him by the "N word."

On March 13, 2002, Fisher called Rogers and French to tell them that the results of her investigation were inconclusive.

Fisher warned Rogers, however, that any sexually inappropriate behavior was prohibited.  The following day, Fisher made a conference call to Hockman and French.  During this call, Fisher told Hockman that there was no evidence to support her allegations and warned her not to engage in racially inappropriate behavior at work.

Hockman was still working at the *Edgewood Enterprise* when Fisher concluded her investigation.  As part of her duties at the *Enterpise*, Hockman was responsible for helping to "paste up" the paper——stories are laid out on sheets to later be printed as part of the newspaper.  Paste ups were done on Tuesday of each week at the *Wood County Democrat* facility in Quitman (the Edgewood facility lacked the appropriate equipment).  At the beginning of April 2002, Hockman missed three consecutive work days, one of which was a paste up day.  Hockman had also missed the paste up day of the previous week.  According to Westward, on April 2, 2002, Holder issued Hockman a written warning that her absences were inexcusable.  Two days later, on April 4, 2002, Hockman tendered her resignation to Westward.

Hockman characterizes the "paste up" incident much differently than does Westward.  Hockman claims that Rogers's harassment caused her to develop a sleeping disorder which required medication and several absences from work.  Because of these absences, Holder issued her a directive "not to be sick on

Tuesdays" and ordered her to provide written confirmation from her doctors' offices reflecting the times and dates of any future appointments.  Hockman quit on April 4, 2002, claiming that her doctor instructed her to resign from Westward because the harassment was having a negative effect on her health.  She claims that she was constructively discharged from Westward.

II. <u>Procedural History</u>

On February 27, 2002, Hockman filed a claim with the EEOC alleging sexual harassment, retaliation, and constructive discharge in violation of Title VII.  On July 25, 2002, the EEOC issued Hockman a determination letter finding insufficient evidence of her allegations.  On October 23, 2002, Hockman filed suit against Rogers and Westward alleging sexual harassment, retaliation, constructive discharge, and sex discrimination against Westward and various state law claims against Rogers.  On September 18, 2003, the district court granted Westward's motion for summary judgment on all federal claims against Westward, and declined to exercise supplemental jurisdiction over Hockman's state law claims against Rogers.[1]

Hockman appealed, claiming that the district court erred in granting Westward's motion for summary judgment as to her hostile work environment, retaliation, and constructive discharge claims.

---

[1] The district court dismissed Hockman's state law claims against Rogers without prejudice.

11

We will consider each claim in turn.

III. <u>Summary Judgment Standard</u>

We review a district court's grant of summary judgment de novo, applying the same standard as the district court. *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 873 (5th Cir. 1999). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the nonmoving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). We review the record in the light most favorable to the nonmovant and draw all reasonable inferences in her favor. *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 414 (5th Cir. 2003).

IV. <u>Discussion</u>

A. <u>Hostile Work Environment</u>

Hockman first claims that she was subjected to a hostile work environment in violation of Title VII. A hostile-work-environment claim consists of five elements: (1) the plaintiff belongs to a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the harassment affected a term, condition, or privilege of her employment; and (5) her employer knew or should have known of the harassment and failed to take prompt remedial action. *Jones v. Flagship Int'l*, 793 F.2d 714, 719–20 (5th Cir. 1986). Only

12

elements four and five are in dispute.

### 1. Whether the Harassment Affected a Term, Condition, or Privilege of Employment

For harassment to affect a term, condition, or privilege of employment, it must be both objectively and subjectively abusive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993); *Butler v. Ysleta Indep. Sch. Dist.*, 161 F.3d 263, 269 (5th Cir. 1998). Whether an environment is objectively hostile or abusive is determined by considering the totality of the circumstances. *Harris*, 510 U.S. at 23. Although no single factor is required, courts look to (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating as opposed to a mere offensive utterance; (4) whether it unreasonably interferes with an employee's work performance, *id.* at 23; and (5) whether the complained-of conduct undermines the plaintiff's workplace competence, *Butler*, 161 F.3d at 270. Because Rogers's harassment was nonsevere and nonpervasive, the district court properly granted Westward's motion for summary judgment on Hockman's hostile work environment claim.

To survive summary judgment, the harassment must be "so severe and pervasive that it destroys a protected classmember's opportunity to succeed in the work place." *Shepherd*, 168 F.3d at 874. The alleged conduct must be more than rude or offensive comments, teasing, or isolated incidents. *Id.* Moreover, "implicit or explicit in the sexual content [of the harassment]

13

[must be] the message that the plaintiff is incompetent because of her sex." *Butler*, 161 F.3d at 270. Hockman has not put forth enough evidence to raise a fact issue with regard to this element.

First, the record is unclear as to how, exactly, Rogers touched Hockman inappropriately. Hockman testified that the first incident of harassment that she remembers occurred when Rogers "would sort of brush up against [her]." Hockman admits, though, that these brushings were neither severe nor pervasive. In fact, at first she thought they were accidental, stating that "just as quickly as it started, with a couple of exceptions—just as quickly as it started, it ended . . . . And once it was over, it was over."

Second, we have found judgment as a matter of law appropriate in cases with facts more egregious than those that Hockman alleges here. In *Shepherd v. Comptroller of Public Accounts*, for example, Shepherd testified that her coworker, Moore, told her, "your elbows are the same color as your nipples," and "you have big thighs" while he simulated looking under her dress. 168 F.3d at 872. Moore stood over Shepherd's desk on several occasions and tried to look down her clothing. *Id.* He also "touched her arm on several occasions, rubbing one of his hands from her shoulder down to her wrist while standing beside her." *Id.* Finally, on two occasions, after coming in late to an office meeting, "Moore patted his lap and remarked, 'here's your seat.'" *Id.*

14

In *Shepherd*, we held that Moore's comments were not as frequent or severe as those we had previously found to alter the workplace environment. *Id.* at 874–75. To illustrate how frequent harassment must be to sustain a hostile work environment claim under Title VII, we contrasted the facts of *Shepherd* with two other Fifth Circuit cases in which the harassment was severe enough for the plaintiffs to withstand the defendants' motions for judgment as a matter of law. *Id.* at 875.

In *Farpella-Crosby v. Horizon Health Care*, the defendant's comments were considered frequent and severe enough to sustain a jury verdict for the plaintiff. 97 F.3d 803, 805 (5th Cir. 1996). In that case, Defendant Blanco frequently made comments "attributing Farpella-Crosby's large number of children to a proclivity to engage in sexual activity." *Id.* Specifically, Farpella-Crosby complained of the following behavior by Blanco:

> Blanco repeatedly commented that he "knew what she liked to do" because she had seven children and that she "must not have a television." At a baby shower held at the facility for another employee, Blanco joked to the group that Farpella-Crosby "[didn't] know how to use condoms." Blanco also frequently inquired about Farpella-Crosby's sexual activity. He would often question her . . . about where [she] had been the night before (while off duty), whether [she] had taken men home, and whether [she] "[had gotten] any." Farpella-Crosby . . . testified that Blanco made similar comments two or three times a week. [She] testified that the comments were so frequent that she could not possibly remember each instance. Blanco threatened Farpella-Crosby with her job on numerous occassions when she asked him to stop making these comments.
> On one occasion, after Farpella-Crosby had eaten lunch in her office with a boyfriend, Blanco said that

15

> "when you open the door [to the office], the smell of fish just hits you in the face. You shouldn't be doing that kind of think at work." . . . Blanco essentially admitted that he did question Farpella-Crosby about her personal life, but claimed that he did so because he believed the lack of sleep resulting from sexual activity could affect her work performance.

*Id.* (last set of brackets in original). On these facts, we held that "there is substantial evidence from which the jury could have concluded that Blanco's comments and questions were sufficiently severe and pervasive as to alter the conditions of [Farpella-Crosby's] employment and create an abusive working environment." *Id.* at 806.

The harassment alleged by the plaintiff in *Waltman v. International Paper Company*, 875 F.2d 468 (5th Cir. 1989), was worse. There, we reversed summary judgment for the defendant on the following facts: One of the defendant's employees several times broadcast obscenities directed at Waltman over the public address system. *Id.* at 470. After that incident, "other employees began making suggestive comments to Waltman." *Id.* at 470-71. Waltman's supervisor urged her to have sex with a coworker. *Id.* at 71. On several occasions, he also "pinched her buttocks with pliers and tried to put his hands in her back pockets." *Id.* Her supervisor and coworkers constantly made such remarks as "I would like a piece of that" (referring to Waltman). *Id.*

Over the course of about three years, Waltman received over

16

thirty pornographic notes in her locker. *Id.* "Sexually explicit

pictures and graffiti were drawn on the walls of the powerhouse,

on the restroom walls and on the elevator." *Id.* Some of these

drawings were directed at Waltman.[2] Waltman also testified that

many of the men would leave their lockers open and that the

lockers contained pornographic pictures and used tampons. *Id.* at

471 & n.1. Waltman's supervisor testifed that the walls of the

work space contained drawings of naked men and women. *Id.* at 471.

On one occasion, one employee told another that "Waltman was

a whore and that she would get hurt if she did not keep her mouth

shut." *Id.* On another occasion, Waltman's coworker told her that

he "would cut off her breast and shove it down her throat." *Id.*

That same coworker later "dangled Waltman over a stairwell, more

than thirty feet from the floor." *Id.* On other occasions,

Waltman's coworkers grabbed her breasts and thighs. *Id.*

Waltman testified that eighty percent of the men in her work

place had made sexual comments to her at some point, and a week

did not go by without such comments being made. *Id.* On these

facts, we held that Waltman had raised a fact issue regarding the

existence of a hostile work environment at her work place. *Id.* at

478.

The Supreme Court has repeatedly stated that "simple teasing,

---

[2] For an explicit description of the graffiti, see *Waltman*, 875 F.2d at 471 n.2.

offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted)(citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)). Therefore, contrasting the facts in *Shepherd* to those in *Farpella-Crosby* and *Waltman*, we held that Moore's comments were "boorish and offensive," but not severe. 168 F.3d at 874. Rather, "each comment made by Moore [was] the equivalent of a mere utterance of an epithet that engenders offensive feelings," but did not suffice to survive summary judgment. *Id.* (citing *Harris*, 510 U.S. at 21-22). In short, Moore's comments were not in the same league as that behavior for which courts afford relief under Title VII. *Id.* at 874-75.

Here, Hockman claims that in the approximate year and a half that she worked for Westward, Rogers harassed her in the following ways: (1) he once made a remark to Hockman about another employee's body, (2) he once slapped her on the behind with a newspaper, (3) he "grabbed or brushed" against Hockman's breasts and behind, (4) he once held her cheeks and tried to kiss her, (5) he asked Hockman to come to the office early so that they could be alone, and (6) he once stood in the door of the bathroom while she was washing her hands. This conduct is perhaps even less egregious than that alleged in *Shepherd*. *Cf. Shepherd*, 168 F.3d

18

at 872 (describing the harassment which included Moore remarking that "[Shepherd's] elbows [were] the same color as [her] nipples," commenting on the size of Shepherd's thighs while pretending to look under her desk, and attempting to look down Shepherd's clothing).  At best, Hockman's allegations are on the same plane as those in *Shepherd*.  Shepherd's allegations were insufficient in that case, and Hockman's are insufficient here.

Rogers's remarks to Hockman about Ledesma's body and requests to be alone with Hockman are offhand comments which are boorish and offensive, but not severe.  Similarly, the newspaper slap amounts to "simple teasing," which "will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788.  The attempted kiss and bathroom incident were isolated incidents which were not serious. *See id.*

The "grabbings" or "brushings" against Hockman's breasts or behind, by her own account, were also not severe.  Hockman did not even estimate how many times this conduct occurred.[3]  *Cf. Waltman*, 875 F.2d at 471 ("Waltman estimated that eighty percent of the men

---

[3] During Hockman's deposition, defense counsel asked her how many times the "grabbings" or "brushings" had occurred, and Hockman responded: "[A]ll I can say is, I know that I would remember specific incidents if it was just two or three or six maybe.  But I don't."  Defense counsel followed up on the question, asking Hockman if she could at least estimate how many times Rogers touched her, to which Hockman responded, "I——I just——I don't know.  I can't give you anything."

19

[at work] made sexually suggestive comments to her," and "testified that a week did not go by without a co-worker directing a sexual comment at her."); *Farpella-Crosby*, 97 F.3d at 805 (describing conduct directed at the plaintiff "two or three times a week," "repeatedly," "often," and on "numerous occasions").

The conduct described by Hockman is simply not in the same league as that at issue in the *Farpella-Crosby* and *Waltman* cases. It is similar to that alleged in *Shepherd*, and we affirmed summary judgment for the defendant in that case. 168 F.3d at 872. As a matter of law, the conduct described by Hockman was not so severe and pervasive as to affect the terms, conditions, or privileges of her employment. The district court properly granted summary judgment for Westward on Hockman's hostile work environment claim.

### 2. Whether Westward Failed to Take Prompt Remedial Action

Even if Rogers's conduct did affect a term, condition, or privilege of Hockman's employment, she still cannot succeed on her hostile work environment claim. There must be evidence that Westward failed to take prompt remedial action upon learning of the alleged harassment. *Jones*, 793 F.2d at 719-20. To the contrary, Westward took prompt remedial action as a matter of law, because Hockman unreasonably failed to take advantage of corrective opportunities provided by Westward.

"When a company, once informed of allegations of sexual harassment, takes prompt remedial action to protect the claimant,

20

the company may avoid Title VII liability." *Nash v. Electrospace Sys., Inc.*, 9 F.3d 401, 402 (5th Cir. 1993). "'Prompt remedial action' must be 'reasonably calculated' to end the harassment." *Skidmore v. Precision Printing and Packaging, Inc.*, 188 F.3d 606, 615 (5th Cir. 1999) (quoting *Jones*, 793 F.2d at 719–20). What constitutes prompt remedial action depends on the facts of the case; "not every response by an employer will be sufficient to discharge its legal duty." *Id.* at 615 (quoting *Waltman*, 875 F.2d at 479). "Rather, the employer may be liable despite having taken remedial steps if the plaintiff can establish that the employer's response was not 'reasonably calculated' to halt the harassment." *Id.* at 615–16.

We have often found that an employer took prompt remedial action as a matter of law. *Id.* at 616 (citing *Hirras v. Nat'l R.R. Passenger Corp.*, 95 F.3d 396, 400 (5th Cir. 1996) (listing *Waymire v. Harris County*, 86 F.3d 424, 428 (5th Cir. 1996); *Carmon v. Lubrizol Corp.*, 17 F.3d 791, 794–95 (5th Cir. 1994); *Dornhecker v. Malibu Grand Prix Corp.*, 828 F.2d 307, 309–10 (5th Cir. 1987)). One factor we have found dispositive is whether the plaintiff reasonably took advantage of corrective opportunities provided by the employer. *See Woods v. Delta Beverage Group, Inc.*, 274 F.3d 295, 300 n.3 (5th Cir. 2001). The district court granted summary judgment on the failure-to-take-prompt-remedial-measures factor for this very reason; Hockman unreasonably failed to bring her

21

complaint to a higher-echelon employee (Fisher) though she was dissatisfied with the way French handled the situation. Hockman's claims that she was told "not to go above French's head," and that French directed her to an outdated harassment policy for another company, even if true, do not overcome the undisputed facts that: (1) Hockman received the Westward employee handbook containing the company's antiharrassment policy; (2)the policy provides that if the employee does not feel that her allegation is being handled satisfactorily by his or her supervisor, then she should report the incident directly to the Director of Human Resources; (3) she acknowledged her receipt of the handbook and understanding of its provisions with her signature; and (4) despite her awareness, there is no evidence that Hockman availed herself of any of the company's provisions after speaking to French, several months after the alleged harassment began. The district court held that whether Hockman subjectively felt that she could not "go over French's head" is immaterial to the fact that the policy she acknowledged directed her to do just that. This analysis is in accord with *Woods v. Delta Beverage Group*, where we applied an objective standard. 274 F.3d at 301 ("A reasonable woman would have felt compelled to report Eddy's alleged post-July 7 harassment to her supervisors. Therefore, [summary judgment was appropriate.]"). We therefore affirm summary judgment for Westward on Hockman's sexual harassment claim; Hockman cannot prove that

22

Westward failed to take prompt remedial action where she unreasonably failed to take advantage of corrective opportunities provided by Westward.

B. Retaliation

Hockman next claims that Westward retaliated against her for filing her EEOC complaint. Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). We analyze retaliation claims under the *McDonnell Douglas* burden-shifting framework. *See Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 167 (5th Cir. 1999) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973)).

To make out a prima facie case of retaliation, Hockman must provide evidence of three things: (1) she engaged in protected conduct, (2) she was thereafter subjected to an adverse employment action, and (3) the adverse employment action was taken in response to her protected conduct. *Chaney*, 179 F.3d at 167. If Hockman succeeds, the burden then shifts to Westward to articulate a legitimate, nonretaliatory reason for the adverse employment action. *Id.* If Westward carries this burden, then Hockman must present evidence showing that Westward's proffered rationale was

23

pretextual, and that engaging in the protected activity was the but-for cause of the adverse employment action.[4]  *Id.*

The filing of an EEOC complaint is clearly a protected activity within the meaning of the statute.  *Walker v. Thompson*, 214 F.3d 615, 629 (5th Cir. 2000) (citing *Dollis v. Rubin*, 77 F.3d 777, 781 (5th Cir. 1995)).  Hockman has therefore satisfied the first element of her prima facie case.

Next, Hockman must present evidence showing that Westward subjected her to an adverse employment action.  In determining whether a defendant's action constitutes an adverse employment action, "we are concerned solely with ultimate employment decisions."  *Id.* (citing *Webb*, 139 F.3d at 540).  "[U]ltimate employment decisions include acts 'such as hiring, granting leave, discharging, promoting, and compensating.'" *Id.* (quoting *Dollis*, 77 F.3d at 782); *Green v. Adm'rs of the Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002).  We have previously found that the following actions on the part of employers did not constitute ultimate employment decisions: refusing to consider the plaintiff for a promotion, refusing to allow her to attend a training conference, and criticizing her work to government vendors, *Dollis*, 77 F.3d at 779-80; the verbal threat of being fired,

---

[4] Hockman has not alleged that Westward acted with mixed motives.  *Cf. Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 414-15 (2003) (explaining the difference between pretext and mixed-motive retaliation claims).

reprimanding the plaintiff for not being at her assigned work station, a missed pay increase, and being placed on "final warning," *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 708 (5th Cir. 1997); changing locks, restructuring office procedures, and clarifying job duties, *Green*, 284 F.3d at 657–58; and a visit to the plaintiff's home by two of her supervisors, one of whom was included in the EEOC charge, to instruct her to report to the company's medical center if her claimed illness was work related, *Mattern*, 104 F.3d at 705. By contrast, we have found the denial of paid or unpaid leave to constitute an ultimate employment decision, *Mota v. Univ. of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 521–22 (5th Cir. 2001), and have suggested that an unwanted reassignment may also constitute an ultimate employment decision, *Walker*, 214 F.3d at 629.

In this case, Hockman claims that Westward retaliated against her in the following ways: (1) transferring her to the *Edgewood Enterprise*, (2) placing her under the supervision of Wilbur Callaway, (3) treating her with hostility, (4) instituting a "baseless" racial harassment investigation against her, (5) issuing her a directive "not to be sick on Tuesdays," and (6) requiring detailed documentation of any future doctors' appointments. In light of the precedent discussed above, the only allegation made by Hockman which might conceivably be classified as an adverse employment action is her transfer to the *Edgewood*

25

*Enterprise*. The other actions are not ultimate employment decisions and therefore do not qualify as adverse employment actions.

Hockman's transfer to the *Edgewood Enterprise* likewise fails to constitute an adverse employment action, however, because it was a purely lateral move. A purely lateral transfer cannot constitute an adverse employment action. *Burger v. Central Apt. Mgmt., Inc.*, 168 F.3d 875, 879 (5th Cir. 1999). We have previously held a transfer to be purely lateral where the new position had "the same job title, benefits, duties, and responsibilities" as the old position. *Id.* As the editor of the *Edgewood Enterprise*, Hockman retained the same pay, duties, and benefits; was reimbursed for her mileage from Grand Saline to Edgewood; and although the Edgewood facility was temporarily filthy, any filth was cleaned up within a week or two of Hockman's arrival. Therefore, this was a purely lateral transfer, and Hockman has failed to make out a prima facie case of retaliation. Accordingly, the district court properly granted Westward's motion for summary judgment.

C. Constructive Discharge

Finally, Hockman claims that she was constructively discharged from Westward. To survive summary judgment on a constructive discharge claim, the plaintiff must provide evidence that working conditions were "so intolerable that a reasonable

26

employee in her position would [have felt] compelled to resign." *Webb v. Cardiothoracic Surgery Assoc. of N. Tex.*, 139 F.3d 532, 539 (5th Cir. 1998).  Mere harassment, alone, is insufficient; rather, the plaintiff must show "aggravating factors" to justify departure.  *See Barrow v. New Orleans Steamship Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994).  Such factors include: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.  *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2000).  Ultimately, to succeed on a constructive discharge claim, the plaintiff must show a greater degree of harassment than is required for a hostile work environment claim.  *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998).

Hockman's constructive discharge claim fails for three reasons.  First, Hockman reiterates the same facts that she alleges constituted harassment by Rogers and retaliation by Westward; she does not allege facts which provide the aggravation required to support a claim of constructive discharge. Second, Hockman alleges that Harvill overheard Callaway say that he would get a bonus from Westward if "he ran Harvill off."  Hockman claims

27

that it is reasonable to assume this deal applied to her as well. Yet Hockman cannot rely on such speculation to survive summary judgment. In *Forsyth v. Barr*, we made clear that summary judgment is appropriate where the nonmoving party "rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." 19 F.3d 1527, 1533 (5th Cir. 1994). That is what Hockman has done here.

Finally, Westward's prompt remedial measures are fatal to Hockman's constructive discharge claim. In *Dornhecker v. Malibu Grand Prix Corporation*, the plaintiff resigned one day after reporting the harassment to her company's president. 828 F.2d 307, 308–09 (5th Cir. 1987). Her employer, however, had assured the plaintiff that she would never have to work with her harasser again. *Id.* at 308. We reversed a judgment for the plaintiff because her resignation had been unreasonable. *Id.* at 310. In doing so, we stated that the plaintiff had not given her employer a fair opportunity to remedy the situation. *Id.*

Here, upon learning of Hockman's complaint, Westward immediately transferred her to Edgewood, separating her from Rogers. Hockman does not allege that she was sexually harassed after being transferred. Westward's prompt remedial action therefore precludes Hockman's constructive discharge claim. The district court properly granted Westward's motion for summary judgment.

28

V. <u>Conclusion</u>

For the foregoing reasons, we AFFIRM the judgment of the district court as to all claims.

AFFIRMED.