Earnestine **WALKER**, Plaintiff,

v.

**SBC SERVICES, INC.,** Defendant.

**No. CIV.A. 3:03–CV–2713–L.**

United States District Court, N.D. Texas, Dallas Division.

June 2, 2005.

---

9. Moreover, it does appear that the parties have now agreed upon a deposition date for these witnesses.

Tom Carse, Law Office of Tom Carse, P.C., Dallas, TX, Counsel for Plaintiff.

David C. Welsch, Dallas, TX, Counsel for Defendant.

## MEMORANDUM OPINION AND ORDER

LINDSAY, District Judge.

Before the court is Defendant's Motion for Summary Judgment, filed November 5, 2004. After careful consideration of the motion, response, reply, competent summary judgment evidence, record and applicable law, the court **grants in part** and **denies in part** Defendant's Motion for Summary Judgment.

### I. *Factual and Procedural Background*

This case arises out of the employment of Plaintiff Earnestine Walker ("Plaintiff" or "Walker") by Defendant SBC Services, Inc. ("SBC" or "Defendant"). Plaintiff filed this case on November 7, 2003, claiming same-sex harassment, racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Defendant has filed a motion for summary judgment, contending that no genuine issue of material fact exists with respect to any of Plaintiff's asserted claims, and that it is therefore entitled to entry of judgment as a matter of law. The court now sets forth the facts upon which it relies to resolve the summary judgment motion. In setting forth the facts, the court applies the summary judgment standard as set forth in the following section.

Plaintiff is an African–American female currently employed by Defendant. Pl. App. at 43–44. From October 1, 2001 through mid-August 2003, Plaintiff worked at Defendant's Materials Distribution Center ("MDC") in Lancaster, Texas as a senior records clerk. *Id.* at 49–55, 111; Def.

App. at 73–76. Plaintiff was supervised by Sherrill Warmack, a Caucasian female, who had been employed by SBC or one of its affiliates since 1977, and had been a manager since 1978. Pl. App at 48; Def. App. at 81. Warmack worked approximately four days per week at a call center in downtown Dallas, and worked one day per week at the MDC in Lancaster. Pl. App. at 109, 112; Def.App. at 78–80, 82, 97. Warmack's one day at the MDC was generally a "play day," and was spent with "personal conversation" and "long lunches." Pl.App. at 219.

The MDC is primarily a warehouse containing several "office pods," two-story structures consisting of break rooms on the first floor and office cubicles with partial partitions on the second floor. Pl.App. at 110. Plaintiff worked in the PICS inventory reconciliation group ("PICS group"), one of SBC's two automated systems used to track materials inventory. *Id.* at 107–08. Three other women worked in the PICS group during the relevant time period: Marilyn Brown, Linda Patrick, and Gloria Cantu. *Id.* at 108, 129. The "Control Group" shared the same office pod as the PICS group, and consisted of Gwen Randow (until her retirement in 2002), Phyllis Jackson (Randow's replacement), and Sheila Thrasher. *Id.* at 120, 122–23, 129–30. Linda Kovar, who supervised a different group, shared the same office pod. *Id.* at 122. All of the women sharing the office pod with Plaintiff were Caucasian, with the exception of Gloria Cantu, who was Hispanic, and Phyllis Jackson, who was African–American. *Id.* at 120, 122–23, 129–30; Def.App. at 86–87.

Cindy Jones, whom Plaintiff replaced, was to have trained Plaintiff. Pl.App. at 46, 136. After briefly going over how to log onto the computer system and some screen functions, on or about October 23, 2001, Jones advised Plaintiff that she could not help her train and referred her to Brown and Cantu. *Id.* at 31. Brown refused to train her and Warmack advised Plaintiff that she was "s* * * out of luck." *Id.* at 31, 137. Warmack never trained Plaintiff regarding how to do her job, as she expected Plaintiff to learn the job as she went. Def.App. at 73–76.

### A. Sexual Comments and Conduct

Between October 2001 and mid-August 2003, Warmack made sexually explicit, crude and vulgar comments in Plaintiff's presence. On one occasion, Plaintiff overheard Brown, Patrick, Cantu, Randow and Warmack discussing Valentine's Day, and she heard Warmack say to the other women that she would be giving her husband "p* * * *" for Valentine's Day, "all the p* * * * he wants[,]" and "[h]e can ride this cat until it [is] fat and sw[ollen]." Pl.App. at 90, 152. The reply from one of the women present was, "Oh, my God, Sherrill. I can't believe you said that." *Id.* at 90. Plaintiff "was humiliated and literally sick from this conversation." *Id.* at 142. In another incident, Plaintiff overheard Warmack telling Brown, Kovar and Randow about a conversation she had previously had at the downtown Dallas office, which she thought was "so funny" that she wanted the "girls" at the MDC to hear it (*id.* at 152); Warmack recounted how she had told the downtown Dallas staff that after she gave birth, "her husband, Rick Warmack asked the doctor to give her extra stitches … [i]n order to make her p* * * * tighter." *Id.* at 90, 152. Warmack "stated that these ladies just burst into laughter," but that Warmack told them "it is a true statement." *Id.* at 90, 144. As a result of overhearing this discussion, Plaintiff "had to leave the room and couldn't work for quite awhile afterward." *Id.* at 144. Plaintiff also overheard a conversation among Warmack, Randolph, Patrick, Cantu, Brown and Thrasher involving a pill containing alum,

which Plaintiff describes as a pill that she believed "was supposed to make ... a lady's private part tighter or something—younger or something." *Id.* at 53. Warmack also told Plaintiff that David Zbytovsky, an African–American supervisor at MDC, was a "p* * * *." *Id.* at 83, 135, 154.

In addition to making the sexually explicit statements, Warmack acted-out in a sexually explicit way, including an incident at Dick's Last Resort in the West End in Dallas on Bosses Day in or around October 2001. On this occasion, Warmack simulated oral sex with a novelty drink, which involved a condom, along with whipped cream, which Warmack licked off the glass and her hands, and said, "Oh, yeah, baby, just the way I like it, standing hard and tall" after which she told the waitress she "could handle another one of those." *Id.* at 59–60, 83. In addition, on one occasion, Warmack removed her blouse at the office to show her new brassiere from Victoria's Secret. *Id.* at 73–74, 216. Plaintiff was offended when Warmack removed her blouse. *Id.* at 73.

### B. Racial Remarks

During the time Plaintiff worked at the MDC, Warmack (in addition to other Caucasian SBC employees at the MDC, including Randow and Brown) made derogatory remarks about African–Americans. Some of the remarks were directed to Plaintiff, and other remarks to co-employees in Plaintiff's presence.

Shortly after Plaintiff began working at the MDC, on or about October 17, 2001, Warmack came over to her staff's cubicles on the second floor of the office pod where a discussion ensued about the book *Dante's Inferno.* Warmack stated that the blacks in Africa suffer "the seven levels of hell" described in *Dante's Inferno* if they are not witnessed by a white Christian missionary and do not accept Christ. She also stated that if Africans are not Baptists they go to hell. *Id.* at 83, 154. As part of this conversation Warmack further stated that: "it pisses her off to hear black people always complaining about slavery, when they ... were saved from seven levels of hell when they came over to America." *Id.* at 30, 83. Warmack also stated that blacks were "cursed black when God got mad at one of his angels, kicked him out of heaven, and cursed him black." *Id.* at 154. Also in October 2001, while standing next to Plaintiff's desk, Warmack and Marilyn Brown made comments about Constance Hollie's allegedly offensive body odor after Hollie left the ladies room, and Warmack stated that Hollie had smelled that way for twenty years. *Id.* at 82, 154. Hollie was African–American. *Id.* at 82.

In late October 2001, Warmack referred to Plaintiff as a "dumb ass Cingular person" that came to MDC with payroll problems. Also in October 2001, Warmack and others, including Randow and Patrick, had a discussion about Sherry Walker's hair. Sherry Walker is African–American. As part of this discussion, Plaintiff was asked by her white co-workers: "Why do we weave our hair? And that isn't black people hair what you call nappy. Why is some of y'all hair straighten[ed]" and "What is it with y'all about your hair." *Id.* at 30, 85, 135–36, 234–35.

Also in or around October 2001, Warmack and her staff were discussing David Zbytovsky, an African–American supervisor at the MDC warehouse. They stated that Zbytovsky's wife was so fat and that he was a "p* * * *." They then asked Plaintiff "why black men always go for fat white girls" and stated that "when a black man gets a white girl, he thinks that he is hot s* * *." *Id.* at 30, 83, 154. Warmack then stated that she did not have anything against blacks, but believed they needed to stick to their own kind. *Id.* at 154.

In November 2001, Warmack gave Plaintiff a thirty-day evaluation, something that was not done with Plaintiff's co-workers. Plaintiff felt that the evaluation was more of a threat than an evaluation. Warmack told Plaintiff that Plaintiff "would do fine in [her] position as long as [she] got along with the people [she] worked with." *Id.* at 86. Warmack also stated that "[i]f she were [Plaintiff]," she should not get "smart mouth" or have any "altercation" with the others, and that "this [office] is a laid back environment, that what goes on in this office stays in this office. No one tells anything that is said up here and as long as [Plaintiff] understand [sic] that we should not have any problem." *Id.* During the "evaluation," Warmack threatened Plaintiff with termination, stating she would "fire [Plaintiff's] black ass if [she] came here [late]." *Id.* at 78.

Also in November 2001, Gwen Randow, a Caucasian female from the Control Group who shared the office pod, came into the office complaining of Zbytovsky, referring to him as "that black S.O.B. he don't know sh* * and that is why no one downtown likes to talk to him because he don't know what in the f* * * he is doing." *Id.* at 70, 87, 139. Randow called Zbytovsky a "dumb ass" and told Plaintiff that "I don't have anything against blacks. [Zbytovsky] just gets on my nerve [sic] because he is dumb as hell ... They gave him that job to keep their government contracts." *Id.* at 87, 155. That conversation then evolved into a group discussion among the white women sharing the office pod on how "minorit[ies are] being put in position because it is a requirement by law. How it pisses them off, when someone else has more experience but because a guy is black and dumb as hell he gets the job first." *Id.* at 87, 139. Brown told the group that her husband lost a bricklaying job to a "black S.O.B.," whom she also called a "Black m* * * * * f* * * * *," "even though her husband could do the job

three times better." *Id.* at 87, 139, 155, 226. Sheila Thrasher recalls Brown using the term "black m* * * * * f* * * * *" on at least two occasions. *Id.* at 227.

In a further incident involving racial comments by Randow, Randow and Steve Mostiller, an African–American employee at the MDC, had an altercation in which Randow referred to Mostiller's race, and told her supervisor that "she wants his black ass fired and she wanted that to happen now," after which Mostiller was sent home. *Id.* at 87, 139. In December 2001, Plaintiff witnessed Brown, Kovar, Patrick and Randow planning to get Mostiller fired, complaining to Randow's manager that Mostiller had threatened to send a pipe bomb to Randow, that there was a package in the mailroom without an address and that Mostiller had been in the military. *Id.* at 87, 140. Mostiller was eventually fired due to these complaints. *Id.*

Following this incident involving Mostiller, Plaintiff overheard many comments about how rednecks rule at MDC, including Randow stating that "you don't f* * * with me if you want your job. So let another one of them try some sh* * like that [and] I will have their job as well," and Brown then stated: "Let this be a lesson for the rest to learn, that Red neck rules [sic] and you don't f* * * with my friends[.]" *Id.* at 87, 155, 213–214, 218. In addition to Plaintiff's testimony, Sheila Thrasher also heard the comments at the MDC that "red necks rule." *Id.* at 213–14, 218. According to Thrasher, after Marilyn Brown's son was asked to perform in the MDC warehouse rodeo, "there was mention that even though the warehouse was mostly black, rednecks still rule." *Id.* at 214. Thrasher recalls Plaintiff telling her that she was offended by comments about rednecks ruling in the MDC warehouse. *Id.*

In or around January 2002, Warmack initiated a conversation about the film, *Pearl Harbor*, which turned into a discussion about a black serviceman's family's attempt to get him a Purple Heart for his military service. Warmack stated to the entire office pod in a vocally antagonistic fashion: "Hell, I don't see why, because blacks were only allowed to cook or work in the kitchen. Do you really think they would be trusted to fire a weapon?"[1] *Id.* at 65–66, 88, 141. Upon looking at a picture of two or three black men, Warmack stated she "couldn't tell neither [sic] one of them apart" because "they all look alike." *Id.* Warmack further stated to the group of employees "how back in those days, the n* * * * * * wasn't allowed to carry ... firearms or shoot," further stating that "if you give a n* * * * * a gun, they will probably kill the crew for [what] they went through in slavery." *Id.* Following this discussion, the same group of women began to discuss "why ... black people get upset when whites say the 'N' word but then we call each other that ... we don't get offended[.]" *Id.* at 66. In this conversation (and others), Warmack used the term n* * * * * several times. *Id.* Also around this time, Warmack stated to Plaintiff that "the way she was raised ... she didn't see anything wrong with calling black people n* * * * * * because that's what we—we were." *Id.*

Also in January 2002, Warmack had a conversation with Brown, Randow, Cantu and Patrick in Plaintiff's presence about Shirley Crawford, an African–American employee in the warehouse. Warmack stated that if Crawford kept up her weight loss she would be so tiny they would not recognize her. Warmack then stated that it would be a miracle because ain't none of them are small. What black women call small would be considered to us too damn fat, and that she would still be too large for Warmack even if she lost another 50 pounds. *Id.* at 88, 141–42.

David West, a downtown Dallas manager, on at least two occasions referred to the warehouse workers at the MDC as "monkeys." *Id.* at 213, 215. The warehouse employees were primarily African–American. *Id.* at 214–15. Also during this time period, SBC hung a "teamwork" poster in the lobby of the MDC that pictured two chimpanzees. *Id.* at 99–100, 145.

## C. Plaintiff's Internal Complaints & SBC's Response

Defendant's Code of Business Conduct prohibits all forms of racial and sexual discrimination, including harassment. Def.App. at 125–168. Defendant's maintain an Ethics/Ombuds Helpline (the "Helpline") which employees may call to complain about perceived violations of the Code of Business Conduct. The Helpline takes the caller's information and refers the complaint to the appropriate department in the company. *Id.* Employees may also contact their supervisor or the Human Resources department with complaints

**1.** Warmack's statements appear to refer to Dorie Miller, a black hero of World War II. In light of Warmack's incorrect statements, a history lesson is in order to set the record straight. Miller was a steward serving on a United States battleship in Pearl Harbor when the Japanese attacked without warning on December 7, 1941. His battleship came under heavy fire, and the person operating one of the anti-aircraft guns was killed. Miller, who had no formal training because blacks were only allowed to serve as cooks, porters, or stewards, manned the anti-aircraft gun and shot down four Japanese fighter planes. For his heroic efforts, Miller received the Navy Cross, which was established in 1919 and is a "decoration awarded for extraordinary heroism in operations against an armed enemy." Merriam–Webster's Collegiate Dictionary 827 (11th ed.2004). Miller died in 1943 when a torpedo fired from a Japanese submarine struck and blew up his battleship.

about discrimination or harassment. In the end of October 2001, Plaintiff called the Helpline and left a message complaining about racial discrimination, Warmack's racial slurs, the release of Plaintiff's proprietary information and lack of training. The CATS Complaint Summary Report generated following Plaintiff's telephone call, provides, in relevant part:

HOW_ABUSING: WALKER is the only African American employee in the Procurement Department and is reporting to WARMACK. WALKER has heard WARMACK make racial slurs about other black employees. For example, WARMACK has talked about black employee, Connie, last name unknown, and the fact that no one can use the bathroom after Connie because of her odor. Confidential information is discussed with employees who are managed by WARMACK. Since WALKER has been at the location, she has received less than 20 hours in training ... WALKER was informed on 10/23/01, that she will be given a performance evaluation and she is worried that her evaluation will not be a positive one because of lack of training and discrimination. WALKER would like to discuss these issues with a company representative.

*Id.* at 159. On or about October 31, 2001, Plaintiff returned a telephone call from Patricia L. O'Neal, SBC's EEO senior consultant, but was unable to reach her and left a message advising O'Neal of the ongoing problems, but indicating that she did not want to pursue her complaint because she was afraid and did not want to get her coworkers in trouble. *Id.* at 170–71. O'Neal did not investigate Plaintiff's complaint. O'Neal testifies that she did not investigate the claim because Walker said she did not want to pursue it. O'Neal also testifies that she did not investigate Plaintiff's complaints because the conduct of

which Plaintiff complained "was not that severe." Pl.App. at 162.

In December 2001, Plaintiff placed a telephone call to her department's human resources support number and reported the incident at Dick's Last Resort, where Warmack had simulated oral sex with a novelty drink during a work lunch. Plaintiff's call was referred to O'Neal, who subsequently spoke with Plaintiff, who told O'Neal about the Dick's Last Resort incident, race discrimination and the lack of training she was receiving. Among other things, Plaintiff detailed comments by her white co-workers referring to themselves as "rednecks," and stating that "rednecks rule," and further that her co-workers referred to blacks as "those people," as "dumb," or said that they smelled. Def. App. at 128. Walker asked O'Neal not to interview her co-workers as part of the investigation. *Id.* at 172–73, 175–76. In response to Walker's complaints, O'Neal "spoke with Ms. Warmack on February 7, 2002 about Ms. Walker's concerns[,]" recommending to Warmack that she "needed to be careful not to place herself in an inappropriate position, such as the incident at Dick's Last Resort." *Id.* O'Neal "did not speak with Ms. Walker's co-workers due to [Plaintiff's] request that [she] not do so." *Id.* Finally, O'Neal recommended that "[Plaintiff] and her co-workers attend diversity training." *Id.* O'Neal asked Warmack to provide diversity training to her "clerks" at the MDC warehouse, including Plaintiff. *Id.* at 88.

On March 11, 2002, Plaintiff sent an e-mail to Dick Frost, the senior human resources officer in the Procurement Department at SBC, stating that "things have not gotten any better" at the MDC. *Id.* at 56. The subject line of the e-mail read "H–E–L–P." In the e-mail Plaintiff again complains about Warmack's attitude toward her and states that she "wants to be treat-

ed fair and equal." *Id.* Frost forwarded the e-mail to O'Neal, stating "Please call me on this issue." *Id.* O'Neal thereafter questioned Plaintiff about her complaints and Plaintiff related that she was afraid regarding what her coworkers and managers might do after her complaints.

### D. EEOC Charges & Plaintiff's Disability Leaves

On March 12, 2002, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), complaining of racial discrimination. Pl.App. at 30. Plaintiff went out on disability from April 2002 through July 2, 2002. On July 5, 2002, she filed a second Charge of Discrimination with the EEOC, complaining of racial discrimination and retaliation. *Id.* at 32.[2] Plaintiff went out on her second disability leave from May 2003 through August 2003. Although information pertaining to Plaintiff's disability leaves was personal and confidential, Sheila Thrasher overheard Warmack and the other women in the office pod making derogatory comments about Plaintiff's disability leaves, saying she had a nervous breakdown, and laughing about it. *Id.* at 224. In or around September, 2003, Plaintiff voluntarily transferred to a different position with an SBC-affiliate in downtown Dallas. Def.App. at 49, 73–76.

After receiving her Right-to-Sue letter in September 2003, Plaintiff filed this lawsuit on November 7, 2003. Plaintiff filed her First Amended Complaint on June 9, 2004, and her Second Amended Complaint on September 23, 2004, wherein she alleges that Defendant unlawfully discriminated against her because of her race, sexually harassed her, retaliated against her and subjected her to a hostile work environment, in violation of Title VII.[3] On November 5, 2004, SBC filed its motion for summary judgment. The court now considers this motion.

### II. *Summary Judgment Standard*

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Ragas v. Tennessee Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir.1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202

**2.** On December 5, 2002, Plaintiff filed her third Charge of Discrimination with the EEOC, complaining of racial discrimination, harassment and retaliation for filing her previous EEOC charges. Pl.App. at 193. Plaintiff has not included the claims in this third Charge within the allegations of this suit. Moreover, Plaintiff's Notice of Right to Sue from the EEOC is only with regard to her March 12 and July 5, 2002 Charges. Plaintiff is "currently awaiting action by the EEOC on her [third] charge of discrimination." Pl. Brief in Support of Resp. to Def. Summ. Judg. Mot. ("Pl.Brief") at 34. Accordingly, Plaintiff's third Charge of Discrimination, and the

allegations contained therein, are not before this court.

**3.** Plaintiff's lawsuit also includes a state law claim of negligent hiring, training and retention. *See* Plf. Sec. Am. Comp. at 4, ¶ 17. Following the filing of Defendant's Motion for Summary Judgment, Plaintiff dropped this claim. *See* Pl. Resp. at 2. Also, in her brief in support of her response to Defendant's motion ("Pl.Brief"), Plaintiff makes clear that she is not seeking to bring a separate race discrimination claim for lack of training under Title VII, but that lack of training added to the hostile work environment of which she complains. *See* Pl. Brief at 35.

(1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Ragas,* 136 F.3d at 458. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Anderson,* 477 U.S. at 254–55, 106 S.Ct. 2505.

■■■ Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler,* 73 F.3d 1322, 1325 (5th Cir.1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994). Likewise, hearsay evidence, unless it falls within a recognized exception, is not competent summary judgment evidence. *See Fowler v. Smith,* 68 F.3d 124, 126 (5th Cir.1995). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Ragas,* 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.; see also Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915–16 & n. 7

(5th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

### III. *Analysis*

■■■ Title VII of the Civil Right Act of 1964 provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). As the United States Supreme Court has recognized, "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (internal quotations and citation omitted). An employer violates Title VII when the employer allows the workplace to be "permeated with discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]" *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotations and citations omitted). The

Court in *Harris* further noted that "[t]his standard ... takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Id.*

### A. Plaintiff's Same–Sex Harassment Claims

#### 1. Legal Standard

 In 1998, the United States Supreme Court held that sex discrimination consisting of same-sex sexual harassment is actionable under Title VII. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 79–80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). The Court emphasized that claims of same-sex harassment are subject to the identical requirements as claims of opposite-sex harassment, that is, a plaintiff making a claim of either same-sex or opposite-sex harassment "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted *discrimina[tion]* ... because of ... sex." *Id.* at 81, 118 S.Ct. 998 (original emphasis & punctuation).

 Under *Oncale*, in analyzing a claim of same-sex harassment, the court "first must determine whether the harasser's conduct constitutes sex discrimination." *LaDay v. Catalyst Technology, Inc.*, 302 F.3d 474, 478 (5th Cir.2002). Only if this determination is answered in the affirmative should the court proceed to decide whether the "challenged conduct meets the applicable standards for either a *quid pro quo* or hostile environment claim." *Id.* Relying on the Supreme Court's decision in *Oncale*, the Fifth Circuit in *LaDay* set forth three potential ways in which a plaintiff can show that an incident of same-sex harassment constitutes sex discrimination:

First, he can show that the alleged harasser made explicit or implicit proposals of sexual activity and provide credible evidence that the harasser was homosexual. Second, he can demonstrate that the harasser was motivated by general hostility to the presence of [members of the same sex] in the workplace. Third, he may offer direct, comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace.

*LaDay*, 302 F.3d at 478 (internal quotation marks and citations omitted).

#### 2. SBC's Arguments

 Defendant argues that it is entitled to judgment as a matter of law with regard to Plaintiff's claim of same-sex harassment, since Plaintiff has failed to adduce any evidence that the harassment of which she complains, even if true, constitutes discrimination "because of her sex." *See* Def. Mot. at 2, 18–19; Def. Reply at 3–5. Specifically, SBC argues that Plaintiff's same-sex harassment claim should be dismissed under *Oncale* and *LaDay* since: the comments at issue were made by other females, in the presence of only females, and Plaintiff does not contend that any of the females involved were lesbians or that the comments were related in any way to explicit or implicit sexual proposals, or that the person making the comments was motivated by a hostility to the presence of females in the workplace. *See id.*

In response, apparently seeking to rely on the second method of proof set forth in *Oncale*, Plaintiff argues that:

A review of the sworn testimony shows that as Plaintiff's manager, Sherrill Warmack used her position to further her hostility toward Plaintiff, both because she was a woman and because she was Black. Further, it is Plaintiff's position that Warmack used her position to influence the others in her work group

and in the office facility as a tool to vent her hostility toward Plaintiff. Sherill Warmack was clearly motivated by a general hostility to the presence of Plaintiff in her work group, both because she was a woman and because she was Black.

Pl. Brief at 22. Plaintiff's attempt to fend off Defendant's summary judgment motion by asserting in conclusory fashion that Warmack was motivated by a hostility *toward Plaintiff* because she was a black woman fails as a matter of law to satisfy *Oncale.* First, Plaintiff cites to no evidence and no case law to support her argument. Second, as Defendant correctly argues, under *Oncale* and *LaDay,* a plaintiff attempting to rely on the second method of proving same-sex harassment must "demonstrate that the harasser was motivated by general hostility to the presence of [members of the same sex] in the workplace." *LaDay,* 302 F.3d at 478 (citations omitted). This Plaintiff has not done. Accordingly, Defendant is entitled to summary judgment on Plaintiff's claims of same-sex harassment. *Cf. Davis v. Coastal Int'l Security, Inc.,* 275 F.3d 1119, 1126 (D.C.Cir.2002) (holding in same-sex harassment case that actions of plaintiff's coworkers, which included slashing plaintiff's tires, grabbing their crotches and making kissing gestures, and uttering a phrase used to describe oral sex, "however vulgar ... [did not] constitute[ ] discrimination because of sex.")

### B. Plaintiff's Claim of Hostile Work Environment Based on Gender

Even were the court to find that Plaintiff had satisfied *Oncale* and created a genuine issue of material fact regarding whether the sexual harassment of which she complains constituted discrimination "because ... of sex,"(*Oncale,* 523 U.S. at 81, 118 S.Ct. 998), the court agrees with Defendant's alternative argument that the conduct of which Plaintiff complains was not sufficiently severe or pervasive to create a hostile work environment as a matter of law. *See* Def. Mot. at 20. Thus, Defendant is entitled to summary judgment on Plaintiff's claims of same-sex harassment in any event. After briefly setting forth the legal standard governing hostile work environment claims based on sexual harassment, the court will consider Defendant's alternative argument.

### 1. Legal Standard

■ Plaintiff may prove her sexual harassment claim either by establishing that a tangible employment action was taken against her because of her sex or by establishing that a supervisor with immediate or successively higher authority discriminated against her because of her sex and created a hostile or abusive environment. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 786–87, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 751, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Wyatt v. Hunt Plywood Co., Inc.,* 297 F.3d 405, 409 (5th Cir.2002); *Casiano v. AT & T Corp.,* 213 F.3d 278, 283–84 (5th Cir.2000); *Butler v. Ysleta Indep. Sch. Dist.,* 161 F.3d 263, 268–69 (5th Cir.1998). Plaintiff herein does not seek to prove her claim of sexual harassment based on a tangible employment action, but based on hostile work environment.

■ To establish a sexual harassment claim based on hostile work environment, the employee must show (1) that she belongs to a protected class; (2) that she was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment affected a "term, condition, or privilege" of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt remedial action. *Watts v. Kroger Co.,* 170 F.3d 505, 509 (5th Cir.

1999); *Pfeil v. Intercom Telecomm.*, 90 F.Supp.2d 742, 748 (N.D.Tex.2000). In *Faragher* and *Ellerth*, the Supreme Court modified this test with respect to cases where the alleged harasser is a supervisor with immediate or higher authority over the harassed employee. *Watts*, 170 F.3d at 509; *Pfeil*, 90 F.Supp.2d at 748. In such cases, the employee need only meet the first four elements of the test. *See id.*

A "term, condition, or privilege" of employment is affected when the harassing conduct is severe or pervasive enough to create an objectively hostile or abusive working environment. *Shepherd v. Comptroller of Public Accounts*, 168 F.3d 871, 874 (5th Cir.1999); *Pfeil*, 90 F.Supp.2d at 749. If the conduct at issue was not severe or pervasive, the employer cannot be held vicariously liable for the supervisor's actions. *Wyatt*, 297 F.3d at 409. If, however, the conduct was severe or pervasive, the employer may avail itself of the *Ellerth/Faragher* affirmative defense in an attempt to avoid liability. *Wyatt*, 297 F.3d at 409; *Pfeil*, 90 F.Supp.2d at 749. This defense is comprised of two elements, both of which an employer must establish to avoid liability under Title VII:(1) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) the plaintiff employee unreasonably failed to take advantage of any available preventive or corrective opportunities. *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *Wyatt*, 297 F.3d at 409.

Courts determine whether an environment is sufficiently abusive to be actionable under Title VII by reviewing all of the relevant circumstances, including the frequency of the conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance. *Butler*, 161 F.3d at 269 (citing *Faragher*,

524 U.S. at 787–88, 118 S.Ct. 2275). Incidental or occasional sexual comments, discourtesy, rudeness, or isolated incidents (unless extremely serious) are not discriminatory changes in the terms and conditions of a worker's employment. *Id.*

Even when a hostile environment is shown, the plaintiff must establish that the workplace environment had the effect of altering the terms and conditions of her employment. *Harris*, 510 U.S. at 21, 114 S.Ct. 367; *Nash v. Electrospace Sys., Inc.*, 9 F.3d 401, 403 (5th Cir.1993). Central to the court's inquiry into a hostile environment claim is whether the alleged harasser's actions have undermined the victim's workplace competence, discouraged her from remaining on the job, or kept her from advancing in her career. *Harris*, 510 U.S. at 22, 114 S.Ct. 367; *Shepherd*, 168 F.3d at 874. Title VII is intended only to prohibit and prevent conduct "that is so severe [or] pervasive that it destroys a protected class member's opportunity to succeed in the workplace." *Shepherd*, 168 F.3d at 874. Title VII's overall goal of equality is not served if a claim can be maintained solely based on conduct that wounds or offends, but does not hinder an employee's performance. *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir.1996).

To be actionable, the challenged conduct must be objectively offensive, meaning that a reasonable person would find the conduct hostile or abusive, and subjectively offensive, meaning that the victim perceived the conduct to be hostile or abusive. *See Harris*, 510 U.S. at 21–22, 114 S.Ct. 367.

**2. SBC's Arguments**

In addition to Defendant's argument that Plaintiff has failed to show that the same-sex harassment of which Plaintiff complains was because of her sex, Defen-

dant argues, in the alternative, that it is entitled to summary judgment since the harassing conduct and comments of which Plaintiff complains, even assuming they are true, were not sufficiently severe or pervasive to create a hostile work environment as a matter of law. *See* Def. Mot. at 20. The court agrees.

The evidence, viewed in the light most favorable to Plaintiff, shows that between October 2001 and mid-August 2003, Warmack made sexually explicit, crude and vulgar comments in Plaintiff's presence, including that she would be giving her husband "p* * * *" for Valentine's Day, "all the p* * * * he wants" and that "[h]e can ride this cat until it [is] fat and sw[ollen]" (*see* Pl.App. at 90, 152); that after she gave birth, "her husband, Rick Warmack asked the doctor to give her extra stitches ... [i]n order to make her p* * * * tighter[ ]" (*see id.* at 90, 152); and that Warmack, Randolph, Patrick, Cantu, Brown and Thrasher had a conversation involving a pill containing alum, which Plaintiff describes as a pill that she believed "was supposed to make ... a lady's private part tighter or something—younger or something." *See id.* at 53. The evidence also shows that Warmack engaged in vulgar and boorish conduct, including the October 2001 incident at Dick's Last Resort (*see id.* 59–60, 83), and when she removed her blouse at the office to show her new brassiere from Victoria's Secret. *See id.* at 73–74, 216. The evidence, viewed in the light most favorable to Plaintiff, also shows that Plaintiff was offended by these sexual comments and conduct. *See id.* at 73, 142, 144.

Having reviewed all of the relevant circumstances, including the frequency of the conduct, its severity, whether the conduct was physically threatening or humiliating, or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance

(see *Butler,* 161 F.3d at 269 (citing *Faragher,* 524 U.S. at 787–88, 118 S.Ct. 2275)), the court determines that under the applicable law, Plaintiff has failed to raise a genuine issue of material fact that the sexual harassment of which she complains was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment[.]" *See Harris,* 510 U.S. at 21, 114 S.Ct. 367 (internal quotations and citations omitted). Otherwise stated, given the evidence, no reasonable juror could conclude that the five instances of sexually harassing conduct of which Plaintiff complains were severe or pervasive enough to create an objectively hostile or abusive working environment. *See Shepherd,* 168 F.3d at 874; *Pfeil,* 90 F.Supp.2d at 749. As reiterated by the Supreme Court in *Oncale* with reference to what constitutes illegal discrimination under Title VII:

> And there is another requirement that prevents Title VII from expanding into a general civility code: As we emphasized in *Meritor* and *Harris,* the statute does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex. The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the "conditions" of the victim's employment. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment ... is beyond Title VII's purview." ... We have always regarded that requirement as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace—such as male-on-male horseplay ... for discriminatory "conditions of employment."

*Oncale,* 523 U.S. at 81, 118 S.Ct. 998 (citations omitted); *see also Shepherd,* 168 F.3d at 874 (Where plaintiff's supervisor made a number of sexually offensive comments over the years involving plaintiff's nipples and thighs, as well as engaged in physical contact with the plaintiff's arms and shoulders, the Fifth Circuit concluded that "based upon a consideration of all the circumstances, [the harasser's] conduct did not render [the plaintiff's] work environment objectively 'hostile' or 'abusive.' ").

In short, the court determines that, alternatively, Defendant is entitled to summary judgment on Plaintiff's sexual harassment claims since Plaintiff has failed to create a genuine issue of material fact that the five instances of alleged sexual harassment of which she complains (however boorish, immature, and vulgar) were "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]" *Harris,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). While Warmack's alleged sexually offensive comments and conduct do not fall within the purview of Title VII, the court in no way condones the alleged comments, and finds the alleged behavior, if true, especially unbefitting of one holding the title of supervisor.

### C. Racial Discrimination—Hostile Work Environment

#### 1. Legal Standard

 Hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment. *See National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 116 n. 10, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (and cases cited therein); *Faragher,* 524 U.S. at 786–87, and n. 1, 118 S.Ct. 2275. Thus, a plaintiff seeking to establish a Title VII violation based on race discrimination creating a hostile work

environment must prove that: "(1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment affected a term, condition, or privilege of employment; [and] (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Ramsey v. Henderson,* 286 F.3d 264, 268 (5th Cir.2002). As with a Title VII sex harassment case, in *Faragher* and *Ellerth,* the Supreme Court modified this test with respect to cases where the alleged harasser is a supervisor with immediate or higher authority over the harassed employee. *See generally Faragher,* 524 U.S. at 807–08, 118 S.Ct. 2275; *Watts,* 170 F.3d at 509; *Pfeil,* 90 F.Supp.2d at 748. In such cases, as herein, the employee therefore need only meet the first four elements of the test. Moreover, "[f]or harassment on the basis of race to affect a term, condition, or privilege of employment, as required to support a hostile work environment claim under Title VII, it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ramsey,* 286 F.3d at 268 (internal citations and quotations omitted).

#### 2. Defendant's Arguments

Defendant makes three arguments in support of its motion for summary judgment on Plaintiff's claims of hostile work environment based on race. First, Defendant argues the Plaintiff's claims based on race were untimely. *See* Def. Mot. at 23. Second, Defendant argues that Plaintiff has failed to create a genuine issue of material fact that she was subjected to a racially hostile work environment. *Id.* at 26. Third, Defendant argues that it is entitled to summary judgment on Plaintiff's race claims based on the affirmative

defenses it has raised under *Ellerth/Faragher*. The court addresses these arguments in turn.

### a. The Timeliness of Plaintiff's Claims Based on Race

Defendant argues the Plaintiff's claims based on race were untimely. *See* Def. Mot. at 23. In support, Defendant asserts that Plaintiff's Original Complaint did not include a claim of racial harassment, and that Plaintiff did not add those claims until she amended her pleadings more than ninety days after receipt of her right-to-sue letter, rendering her race claims untimely. Def. Reply at 11. The court disagrees. As Plaintiff correctly points out, Plaintiff attached to her Original Civil Complaint and Jury Demand ("Original Complaint"), and incorporated by reference, her EEOC charges, dated March 12, 2002 and July 5, 2002, both of which explicitly contain claims of race discrimination. *See* Pl.App. at 15–16, 18, 28–29. In addition, Plaintiff's Original Complaint states in paragraph one that she has been denied her right to be free from *"race* and gender discrimination." *Id.* at 14 (emphasis added). Accordingly, Plaintiff's race claims are not untimely and Defendant's motion for summary judgment on this ground is denied.

### b. Hostile Work Environment Based on Race

Defendant argues that Plaintiff has failed to create a genuine issue of material fact that she was subjected to a racially hostile work environment. *See* Def. Mot. at 26. In support, Defendants argue that the conduct of which Plaintiff complains was not severe or pervasive, that the majority of comments were not even directed at Plaintiff, that very few of the comments were racially-tinged, and that many of the comments were "non-racial" or had "no racial overtones at all." *See* Def. Reply at 8–9. A brief review of the evidence, *see*

*supra* at 530 – 532, viewed in the light most favorable to Plaintiff, does not support Defendant's argument.

Defendant's argument fails to take into account that in determining whether an environment is sufficiently abusive to be actionable under Title VII, the court must review all of the relevant circumstances, including the frequency of the conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance. *Butler*, 161 F.3d at 269 (citing *Faragher*, 524 U.S. at 787–88, 118 S.Ct. 2275). As stated by the Supreme Court in *Oncale:*

> [T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances[.]" ... The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to the social context, will enable courts and juries to distinguish between simple teasing ... and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

523 U.S. at 81–82, 118 S.Ct. 998 (citations omitted).

In a case where a defendant pressed similar arguments regarding the purportedly benign nature of certain words of which an African–American plaintiff complained, including black employees being referred to as "all of you," "another one," "one of them" and "poor people," and a supervisor stating "we're going to have to ... get rid of all of you," the Third Circuit rejected defendant's argument that these comments were not racially motivated.

*See Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1082–84 (3rd Cir.1996). As aptly stated in *Aman:* "There are no talismanic expressions which must be invoked as a condition-precedent to the application of the laws of discrimination. The words themselves are only relevant for what they reveal—the intent of the speaker[.]" *Id.* at 1083. As in *Aman,* a reasonable jury could find that comments like those made in this case by Warmack and other white women in the office pod, in addition to comments by David West, and even those comments which Defendant seeks to characterize as race-neutral, carry a clear message that African–Americans are disfavored in the MDC workplace and that members of the African–American race are not "full and equal members of the workplace." *Id.*

■ The evidence regarding the racially charged statements and conduct previously set forth (*see supra* at 530 – 532), which the court must accept as true at this stage, shows disdain and contempt toward African–Americans in the workplace. Only those persons who are racists, incurable optimists, or lack any appreciation of the meaning of the statements made, and the context in which they were made, would fail to comprehend the magnitude and gravity of such statements. The derisive and derogatory manner in which blacks were referred to appears to be "par for the course" at the location in question. As a supervisor, Warmack openly participated in, promoted, and condoned a racially charged work environment. The con-

duct and statements, if true, are precisely the type of discriminatory conduct that Title VII outlaws.

In this case, Plaintiff's evidence, if true, shows a workplace where she was the only African–American, working in an office pod consisting primarily of Caucasian women, led and encouraged by supervisor Warmack. Blacks were belittled and demeaned regularly, and made to fear for their jobs by an environment where "rednecks rule." Considering all the evidence in the light most favorable to Plaintiff, the court concludes that Plaintiff has submitted evidence which, if true, creates a genuine issue of material fact as to whether the MDC was an "environment[ ] so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers[.]" *Meritor,* 477 U.S. at 66, 106 S.Ct. 2399 (quoting *Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972)).[4] Moreover, Defendant's reliance on *Vaughn v. Pool Offshore Co.,* 683 F.2d 922 (5th Cir.1982) is misplaced. *See* Def. Mot. at 27; Def. Reply at 10. In *Vaughn,* the plaintiff, a black man who worked on an offshore oil rig, was frequently referred by his fellow employees and supervisor as "n* * * * *," "coon," and "black boy." *Id.* at 924. In finding that the conduct in question did not violate Title VII, the court emphasized that the plaintiff joined in using "similar opprobriums" to refer to other employees, and that such remarks "were bandied back and forth without apparent

---

**4.** In determining whether an environment is sufficiently abusive to be actionable under Title VII, one of the factors courts consider is whether the alleged offensive conduct unreasonably interfered with the employee's work performance. *See Butler,* 161 F.3d at 269 (citing *Faragher,* 524 U.S. at 787–88, 118 S.Ct. 2275). In this case, Plaintiff has submitted evidence that the alleged conduct unreasonably interfered with her work perform-

ance, including evidence that she missed work after her physician recommended she take time off or quit the job due to stress and, upon her physician's suggestion, took two disability leaves due to stress from her work environment, the first from April 2002 through July 2, 2002, and the second from May 2003 through August 2003. *See* Pl.App. at 143, 146.

hostility or racial animus." *See Vaughn,* 683 F.2d at 924. Unlike *Vaughn,* this case does not present "instances of humiliating acts shared by all." *Id.* Because a reasonable jury could conclude that Plaintiff was subject to a hostile work environment based on race, Defendant's motion for summary judgment on this ground is denied.

### c. *Ellerth/Faragher* Affirmative Defenses

 Finally, Defendant has asserted its affirmative defenses under *Ellerth/Faragher,* arguing that it took prompt remedial action which brought an end to any harassment, and that Plaintiff failed to take advantage of SBC's preventative measures with respect to the harassment of which she complains. *See* Def. Mot. at 29; Def. Reply at 10. In response, Plaintiff argues that Defendant did not take prompt remedial action. Having reviewed the evidence in the light most favorable to Plaintiff and based on the applicable law, the court determines that Defendant has not met its burden of demonstrating that no genuine issue of material fact exists as to whether it took prompt remedial action to end the alleged harassment.

Specifically, the evidence shows that following Plaintiff's October 2001 call to the Helpline complaining about, among other things, racial discrimination and Warmack's racial slurs, O'Neal, the EEO officer at SBC, did not investigate Plaintiff's complaint. O'Neal testifies that she did not investigate the claim because Walker said she did not want to pursue it. Def. App. at 170–71. O'Neal admits that her investigation is not circumscribed by a complainant's request. *Id.* O'Neal also testifies that she did not investigate Plaintiff's complaints because the conduct of which Plaintiff complained, including race discrimination, "was not that severe." *Id.* at 162. In addition, in December 2001, after Plaintiff complained to O'Neal about, among other things, the Dick's Last Resort incident, race discrimination, white co-workers referring to themselves as "rednecks," and stating that "rednecks rule," and further that her co-workers referred to blacks as "those people," as "dumb," or said that they smelled, O'Neal in response "spoke with Ms. Warmack on February 7, 2002 about Ms. Walker's concerns[,]" recommending to Warmack that she "needed to be careful not to place herself in an inappropriate position, such as the incident at Dick's Last Resort"; O'Neal "did not speak with Ms. Walker's co-workers due to [Plaintiff's] request that [she] not do so." *Id.* Finally, O'Neal recommended that "[Plaintiff] and her co-workers attend diversity training." *Id.* O'Neal asked Warmack to provide diversity training to her "clerks" at the MDC warehouse, including Plaintiff. *Id.* at 88. Although, based on the evidence, Warmack was the person most in need of diversity training, O'Neal never recommended that she attend such diversity training.

Based on this evidence, viewed in the light most favorable to Plaintiff, the court determines that Defendant has not met its burden of demonstrating that no genuine issue of material fact exists as to whether it took prompt remedial action to end the alleged harassment.[5] Accordingly, the

---

**5.** This defense is comprised of two elements, both of which an employer must establish to avoid liability under Title VII, namely that: (1) the employer exercised reasonable care to prevent and correct promptly any [racially] harassing behavior; and (2) the plaintiff employee unreasonably failed to take advantage of any available preventive or corrective opportunities. *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 807–08, 118 S.Ct. 2275. The court need not consider the second element, as Defendant has failed to meet its burden of showing the non-existence of a genuine issue of material fact as to whether it took prompt remedial action to end the alleged harassment.

court denies SBC's summary judgment motion on its *Ellerth/Faragher* affirmative defenses.

### D. Retaliation

██ SBC contends it is entitled to summary judgment on Plaintiff's claim of retaliation as the retaliatory action of which she complains did not constitute an adverse employment action. *See* Def. Mot. at 31–32.[6] Specifically, SBC argues that the retaliation of which Plaintiff complains took the form of disclosure of her confidential information regarding her complaints of discrimination, her medical condition and her National Labor Relations charge against her union. *See id.* In her Response, Plaintiff concedes that "under the two charges of discrimination under which this action is filed [she] cannot show an 'adverse employment action' as required to prove a prima facie case of retaliation in violation of Title VII." Plf. Resp. at 34. In light of Plaintiff's concession, the court grants Defendant's Motion for Summary Judgment with regard to this claim without further analysis.

### E. Defendant's Objections to Plaintiff's Summary Judgment Evidence

Defendant has filed various objections to Plaintiff's summary judgment evidence. *See* Def. Reply at 1–3. The court previously set forth the evidentiary standard upon which it relied in determining Defendant's Motion for Summary Judgment. *See supra* at 534 – 535. The court did not consider any evidence that did not meet this standard. In other words, evidence that did not fall within this standard was not considered and played no role in this decision. Accordingly, the court overrules Defendant's evidentiary objections as moot.

### IV. *Conclusion*

For the above stated reasons, no genuine issues of material fact exist with respect to Plaintiff's sexual harassment claim and Plaintiff's retaliation claim. SBC is therefore entitled to judgment as a matter of law on these claims, and they are **dismissed with prejudice.** Genuine issues of material fact however, do exist with respect to Plaintiff's racially hostile work environment claim. Thus, SBC is not entitled to judgment as a matter of law on this claim. Further, genuine issues of material fact exist with respect to the *Ellerth/Faragher* affirmative defenses raised by Defendant. Accordingly, the court **grants in part** and **denies in part** Defendant's Motion for Summary as herein stated. Plaintiff's claim of a race discrimination based on hostile work environment remains for trial, as do the *Ellerth/Faragher* affirmative defenses raised by Defendant.

---

**6.** To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: (1) she engaged in a protected activity; (2) she experienced an adverse employment action following the protected activity; and (3) a causal link existed between the protected activity and the adverse employment action. *Montemayor v. City of San Antonio,* 276 F.3d 687, 692 (5th Cir.2001); *Mota v. University of Texas Houston Health Sci. Ctr.,* 261 F.3d 512, 519 (5th Cir.2001).